# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT KNOXVILLE
### November 15, 2011 Session

## STATE OF TENNESSEE v. KEISHA M. HOWARD

**Direct Appeal from the Criminal Court for Bradley County**
**No. 09-167     Amy Armstrong Reedy, Judge**

_____

**No. E2011-00598-CCA-R3-CD - Filed July 30, 2012**

_____

The Defendant-Appellant, Keisha M. Howard, was indicted for theft of property valued at $60,000 or more and for violating the Tennessee Computer Act, both Class B felonies. She entered guilty pleas to the offenses as charged in the Bradley County Criminal Court, with the trial court to determine the length and manner of her sentence as well as the amount of restitution, if any. See T.C.A. §§ 39-14-103, -105(5), -602(a)(1) (2006). The trial court sentenced Howard as a Range I, standard offender and imposed concurrent sentences of eight years. Under the special conditions in the theft judgment, the court ordered that Howard "may apply to Community Corrections" and that she "owes $215,000 [and] cannot pay that amount but must pay no less than $200 a month." Howard filed a motion to clarify the total amount of restitution owed, and the trial court, in determining that its previous judgment regarding restitution violated Tennessee Code Annotated section 40-35-304(c), ordered Howard to pay $1,000 per month for eight years, for a total of $96,000 in restitution. On appeal, Howard argues that the trial court's order requiring her to pay $96,000 in restitution was unreasonable, given her financial resources and ability to pay. Upon review, we reverse the trial court's order that Howard pay $1,000 per month for eight years for a total of $96,000 in restitution, and we amend the judgments to show that the victim's loss in this case is $156,951.30 and that the restitution, based on the proof established of Howard's present ability to pay, is reduced to $48,000, which shall be paid at the rate of $500 per month for eight years. In all other respects, the trial court's judgments are affirmed.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Criminal Court Affirmed**
**in Part, Reversed in Part, and Amended**

CAMILLE R. MCMULLEN, J., delivered the opinion of the court, in which JAMES CURWOOD WITT, JR., and D. KELLY THOMAS, JR., JJ., joined.

Charles R. Hughes, Jr., District Public Defender; Larry D. Wright, Assistant Public Defender, Cleveland, Tennessee, for the Defendant-Appellant, Keisha M. Howard.

Robert E. Cooper, Jr., Attorney General and Reporter; Cameron L. Hyder, Assistant Attorney General; Robert Steven Bebb, District Attorney General and Stephen M. Hatchett, Assistant District Attorney General, for the Appellee, State of Tennessee.

**OPINION**

**Plea Submission Hearing.** At the plea submission hearing on November 15, 2010, the State summarized the facts supporting the entry of Howard's guilty plea:

> [Ms. Howard] in the date range in the indictment was employed by Outland Travel, a business here in Bradley County. [Ms. Howard] handled the money that came into Outland Travel. She was[,] for all intents and purposes[,] the business['s] [bookkeeper]. It was her job to take the money that came into the business to be deposited. In early January of 2009 the business owner[,] Ms. Donna Davis[,] became aware of missing money. There were trips that had been booked that there were no records of [sic] in the computer system. They started having a lot of problem[s] with their computer system. It was crashing a lot[,] and the state's proof would be that there were items deleted [that] had to have been manually deleted, that they could [not] have been deleted by accident. The computer technician for the business, a young man named Jeremy Jarvis would . . . testify that [during] the time that Ms. Howard worked at this business he was constantly having to come out there to fix the [computer] system. Once [Ms. Howard] was [terminated,] he hasn't been back out there . . . . They have not had a single issue with their computer system. That would be the basis for the violation of the Tennessee Computer Crimes Act. The business operates with a program called TRAMS, [which] allows them to keep track of the bookings that they make through the business. The proof would show that the usual method of doing business is that a person will come in with cash, give the cash to the agent, and . . . the agent documents it and makes copies of it, creates a receipt, and then gives the money to Ms. Howard. Upon the missing money being discovered[,] they also found that the receipt books were missing, [and] they found that several of the computer programs had been deleted. The proof at trial from Ms. Davis[,] as well as two of her employees[,] will be [that] they have spent months going back and reconstructing the books because all these items are missing. [Ms. Howard,] upon being confronted[,] actually confessed to taking money[,] but she disputed the amount of money that was missing. Right now the best guesstimate [sic], and it is a guesstimate [sic], your Honor, is well over $212,000.00 [is] missing. In going through this case . . . , Detective White

obtained Ms. Howard's bank records for the year 2007 and 2008. She deposited over $60,000.00 in cash into her bank account[s]. Obviously[,] if we went to trial[,] Ms. Howard would have to state where that money came from [sic]. Mr. Wright did file a notice of affirmative defense on her behalf, however[,] as I have advised Mr. Wright[,] her income tax returns would be certainly [subject] to scrutiny at that point[,] and she would probably have to [have] a conversation with the Feds [sic] if she tried to claim that [money] as legitimate income. The business owner will testify that upon being confronted with these facts [regarding] this missing money[,] . . . Ms. Howard advised her that she would simply have to go back and [look at] one financial transaction at a time to find all this money, and that is literally what she has done, your Honor. The proof will be . . . that quite a bit of resources [have] gone into this case as far as [Ms. Davis] having to shut down her business, track back[,] and find this missing money and find these bookings. It has tied up her office, it has tied up her employees. [Ms. Howard] requested an expert. [Defense counsel] I think will agree with me that Ms. Davis and her employees went out of their way to assist and cooperate with [Ms. Howard's expert] in providing the records that he requested to make his recommendation. I actually issued a subpoena for him to come testify because I believe that at a trial in this matter he would become ou[r] witness based on the business setup and the fact [that] the money [was] being deposited into [Ms. Howard's] accounts. We would also be presenting [Ms. Howard's] bank records[, which show her cash deposits into] these accounts. There were weeks where [Ms. Howard] was depositing $1800.00 a week, $1200.00 a week [into her bank accounts]. That's over and above the pay check [sic] she was getting from Outland Travel. Those checks were also in her bank records . . . so we could show what her legitimate income was plus cash being deposited, and that would be the state's proof if we went to trial, your Honor.

**February 11, 2011 Sentencing Hearing.** At the February 11, 2011 sentencing hearing, Donna Davis, the victim in this case, testified that she owned a travel agency by the name of Outland Travel. She stated that Howard worked for her as Outland Travel's bookkeeper for five years. Davis said Howard knew how to use Outland Travel's computer system, TRAMS, because she had used TRAMS when she worked for another travel agency. Davis said Howard earned $14.00 an hour for thirty-five to forty hours a week and received an annual bonus of approximately $200.

Davis first realized that Howard was stealing money from Outland Travel when two different churches asked questions about the money they had paid for their respective trips. Shortly thereafter, Davis discovered that Howard had deposited a check made payable to

Outland Travel in the bank account for Davis's other company, Farmer's Lake, which was a "cash only" business. When she investigated the matter, she realized that Howard had deposited checks made payable to Outland Travel into the Farmer's Lake bank account on several occasions. When Davis attempted to review the bank statements regarding these deposits, she discovered that all the bank statements were missing from the office[18]. Davis also discovered that all of the folders containing the copies of the cash that Outland Travel had received from clients were gone as well. Davis later realized that Howard deleted all of the payments to Outland Travel on the TRAMS system so that the system appeared as if the clients never paid Outland Travel. Davis also discovered that Howard was intercepting her commission checks and other agents' commission checks and was converting this money to her own use.

Davis stated that at the end of 2008, Howard confessed that she had been charging her personal trips on Outland Travel's credit card, writing deposit slips and personal checks for the amounts that she had charged, and then deliberately failing to deposit her personal checks to reimburse the business. Davis said that Howard gave her a list of all of her unreimbursed trips, which amounted to approximately $13,000 that she had stolen from Outland Travel. Around this time, Davis noticed that TRAMS was not functioning correctly. When Davis asked Howard about TRAMS, Howard assured her that she would fix the system. Davis later realized that TRAMS was not functioning correctly because Howard had been manually deleting information from the system.

Shortly after Howard confessed that she had stolen approximately $13,000 for her trips, Davis requested bank statements for the last two years. When Howard realized that Davis had requested these statements, she got nervous and destroyed most of the incriminating evidence in Outland Travel's office around New Year's Day 2009. The destroyed evidence included copies of the cash received from clients, the bank account records, and the receipt books. Davis also said that Howard tried to hide her theft by increasing the total cost of booked trips, which made the agents' commissions appear larger. On January 7, 2009, Howard deleted all of the records in TRAMS for the last ten years. Consequently, Davis terminated Howard on January 8, 2009. Davis said she had no operational problems with TRAMS after she terminated Howard.

Davis stated that for the years 2007 and 2008, while Howard was working for her, only $850.00 was deposited into Outland Travel's bank account. However, in 2009, after Howard's termination, over $85,000 was deposited into Outland Travel's account, despite the fact that 2009 was a difficult year for the business because of the struggling economy. After fully investigating the matter, Davis discovered that Howard had stolen over $200,000 from Outland Travel. She also said that Howard only partially reimbursed her for the trips she had charged to Outland Travel's credit card.

-4-

Herbert Tamer, a certified public accountant, was tendered as an expert in forensic accounting for the defense. Tamer said he could not determine the location of the missing cash from Outland Travel because he had not been provided with the bank statements for all of Davis's businesses and the bank statements for all the employees working for Outland Travel. He opined that no proper controls existed for handing cash at Outland Travel. He also noted that Davis commonly transferred funds from Outland Travel to her other business entities. Tamer stated that, after applying recognized accounting standards, the only amount of missing money from Outland Travel that he could trace to Howard's bank account was $4,554.

On cross-examination, Tamer admitted that he focused on Howard's deposits into her personal bank accounts rather than her expenditures. He also admitted that he did not ask Howard to account for all of cash deposits that she made into her bank accounts during the period covered by the indictment.

Howard testified that she was currently employed at Express Employment, where she earned $10 an hour. She said she briefly worked at T-Mobile before being employed at Express Employment. Howard said she had graduated from high school and had taken some college classes but had not earned a degree. Before working at Outland Travel, Howard had worked in the ticketing department and accounting department of Ocoee Travel Service. She first began working at Outland Travel in June 2003 and worked there on a full-time and part-time basis until she was terminated in January 2009. Howard said she had custody of her three daughters. However, she said that since her arrest her daughters had been living with their paternal grandparents, who were receiving the $308.74 per week in child support that Howard typically received from her ex-husband. Howard said she hoped to have her daughters return to live with her if she received an alternative sentence. She acknowledged that the child support payments of $308.74 per week would be paid to her at the time that her daughters returned to her home.

Howard said she knew the amount she had stolen for the trips she charged to Outland Travel's credit card. However, she said she did not have a record of the cash that she stole from Outland Travel. Howard acknowledged that she charged trips to Germany, Disneyworld, and Jamaica to the company's credit card. She also admitted that she charged a cruise to the company credit card, and when she had to cancel the trip, she converted some of the travel insurance proceeds to her own use. However, Howard claimed she paid Davis approximately $13,000 for the trips that she charged to Outland Travel's credit card.

Howard said she paid for her ex-boyfriend's surgeries and paid for car parts to support her ex-boyfriend's hobby of buying and reselling cars during the time period covered by the indictment. Howard denied stealing $215,000 from Outland Travel. Instead, she estimated that the amount she stole was between $35,000 and $40,000, although she acknowledged that she could have stolen as much as $60,000. She said she stole just enough money at a time to pay her bills.

Howard said she began residing with her current boyfriend, Kenneth Walker, in July 2009. She said she had no mental or physical problems that would prevent her from working. Howard acknowledged telling the presentence investigating officer that she could pay $200 per month in restitution.

On cross-examination, Howard acknowledged that she earned either $12.50 or $14.00 an hour while employed by Outland Travel. During the time period that she stole money from Outland Travel, she lived with her ex-boyfriend and her three daughters and paid nearly all of the bills. Howard acknowledged the difficulty in calculating the total amount of money she stole from Outland Travel because she deleted the incriminating information from the computer system and destroyed most of the physical evidence documenting the money she stole.

Howard acknowledged that her personal bank statements showed large numbers of cash deposits. She also acknowledged that she spent more than $3,000 on car parts and tires during the relevant period. She admitted that she sometimes spent $6,000 a month, despite the fact that she only declared $20,000 in income on her taxes. Howard further admitted that she deposited nearly $10,000 in January 2008 and made seven different deposits totaling over $9,000 in February 2008. She also admitted withdrawing over $6,000 in cash in March 2008. Howard said that some of these deposits stemmed from the fact that she often cashed her paycheck and her child support checks before depositing them into her accounts during this period. She also said she deposited cash payments that her mother gave her for a Honda CRV that was financed in Howard's name. However, Howard admitted that there were months when she deposited cash in addition to the documented deposits of her paychecks and child support checks.

On redirect examination, Howard confirmed that she had no assets. She claimed she had not bought any real estate, fur coats, diamonds, or jewelry with the money she stole.

At the close of proof, the State asked for $215,000 in restitution, although it recognized that the court would have to determine Howard's ability to pay. The State made no request as to Howard's sentence. Defense counsel reminded the court of the twelve letters of recommendation that had been written on Howard's behalf. He also stated that Howard

was challenging the total amount of the victim's loss, not whether she owed some amount of restitution in this case.

At the close of the sentencing hearing, the trial court found that the victim provided credible testimony regarding the $215,000 in losses. However, the court stated that it did not find Howard's or Tamer's testimony to be credible. Ultimately, the trial court made the following determination:

> I'm going to sentence her to eight years in the Department of Correction[,] and I'm going to let her apply to the Community Corrections Program. I'm going to order that if she is accepted [in]to that program[,] she would be ordered to pay a minimum amount of $200.00 monthly toward her monies owed, which are great. I do not feel as though I can order her to pay $215,000.00 because she can't do that based on the proof we have here today, and that would serve no purpose, and so instead I find that she owes $215,000.00 and that she shall pay no less than $200.00 a month and if she fails to do that [then] that would be a violation of [her] alternative sentence if she's placed on that program. Now, I don't know . . . if there's a civil judgment out there against her . . . . If she wants to apply to the Community Corrections Program she will have to go into custody. That's a Department of Correction[] program[,] and they [cannot] begin their investigation until she [goes into custody]. That's something we no longer start without someone being in custody. Counsel will have to talk to her about the ramifications of that and whether . . . she wants to do that, or file an appeal relative to the sentence in this case.

On February 14, 2011, judgments were entered sentencing Howard as a Range I, standard offender to concurrent sentences of eight years for the offenses of theft of property valued at $60,000 or more and violating the Tennessee Computer Act. Under the special conditions in the theft judgment, the court stated that Howard "may apply to Community Corrections" and that she "owes $215,000 [and] cannot pay that amount but must pay no less than $200 a month."

On February 24, 2011, Howard filed a "Motion for Clarification of Judgment." In it, Howard asked for clarification of "the total amount of restitution [she] is required to pay[.]"

**March 9, 2011 Hearing.** At the March 9, 2011 hearing on Howard's "Motion for Clarification of Judgment," the trial court refused to sign an order stating that Howard was to pay $200 a month for eight years for a total of $19,200 in restitution. The court emphasized that the victim and Howard had a right to be present at any hearing that determined the total amount of restitution owed, and the State acknowledged that the victim

had not agreed to a total restitution amount of $19,200. The court then stated, "There was no finding by the Court and there was no real hearing about [Howard's] ability to pay [restitution at the February 11, 2011 sentencing hearing]. [Instead, w]e had an all[-]day hearing about how much restitution was owed[.]" After hearing arguments from counsel, the trial court determined that it would have to conduct an evidentiary hearing before it could specify the exact amount of restitution owed. The court set the evidentiary hearing for March 10, 2011.

**March 10, 2011 Hearing.** At the March 10, 2011 hearing, Howard testified that, prior to working at Outland Travel, she worked at Ocoee Travel Service earning $12.45 an hour before the company moved to Atlanta. She also stated she earned $12.35 to $12.50 an hour at Outland Travel prior to her termination. She said she then worked briefly at T-Mobile, where she earned $9.00 an hour, before she began working temporary jobs at Express Employment, where she earned $10.00 an hour for 35 to 42 hours per week, which resulted in $330 to $350 per week in net income.

Howard said she had graduated from high school and had taken some college courses in the pre-pharmacy program. She acknowledged that the two felony convictions in this case would likely prevent her from attending pharmacy school or acquiring her pharmacy license from the state. Howard also said she had skills in data entry, bookkeeping, and general office work. She stated she had lost several jobs because of her pending felony charges.

Howard then detailed her expenses as of the February 11, 2011 sentencing hearing, which were included in the presentence report. At that time, she paid $225 per month in rent, which represented her one-half share of the rent. She also paid between $30 and $80 a month for her electric bill and $45 a month for her cell phone. Howard said that she paid $328 per month for her 2005 Volkswagen Jetta. She also owed more than $5,000 on her CitiBank MasterCard, for which she made monthly payments of $80 to $90 dollars. Moreover, Howard said that she possessed an Orchard Credit Card, for which she made monthly minimum payments of $60 to $70. She also stated she had two educational loans totaling $4,500, for which she made monthly payments of $110. Howard said she paid $85 a month for car insurance. She owed a $350 debt to Verizon, and she made monthly minimum payments of $20 to $30 on this debt. She owed her daughter's orthodontist $1,600 and made monthly payments of $195 on this debt. Howard owed T-Mobile $55. She also owed Memorial Hospital $300, for which she was making $100 payments each month, and owed Volunteer Electric $350. She stated she paid approximately $200 a month for groceries and approximately $140 a month on gas. Howard said she had only about $50 to $100 in the bank after paying all of her expenses. She said she had no assets and no money in any savings or trust accounts. Finally, she said she would receive $308.74 per week in child support if her daughters returned to live with her.

On cross-examination, Howard denied that she received money from her mother every month. She stated that her mother had made cash payments to her for a Honda CRV financed in her name until the car's debt was paid in full. She also said her mother would occasionally give her money to pay for her cell phone bill, her school books, or her daughters' clothes. She stated she was currently living with her boyfriend, Kenneth Walker, who worked at Economy Honda in Chattanooga. She admitted that Walker had been paying all of her bills because she did not have a job. She also admitted that Walker would continue to pay her monthly expenses if she could not pay them. Howard said she would pay one-half of the couple's bills when she had a job.

In response to questioning by the trial court, Howard stated that she "blew" all of the money that she stole from Outland Travel and that she had no assets to show for this money. She said she used the money she stole to travel and to pay her bills. She denied establishing educational or trust funds for her daughters with the money she stole. At the end of the hearing, Howard admitted she had just been accepted as an independent contractor for a host travel agency starting January or February 2012. She said she hoped to make between $1,000 and $2,000 a month booking travel. However, she acknowledged that she would not be earning $1,000 to $2,000 a month because she would have to pay the expenses related to this business. Howard reiterated her belief that she could pay $200 month in restitution.

The trial court considered Howard's ability to increase her earnings and determined that the total amount of restitution owed in this case was $215,000. The court found that Howard was not a credible witness and that Tamer, her expert, did not have common sense regarding crimes of theft. However, the court found that Davis was a credible witness and that the State had met its burden of establishing that Howard owed $215,000 in restitution.

At the conclusion of the hearing, the trial court stated that it did not include a total restitution amount that Howard was ordered to pay in its February 14, 2011 judgment because the court intended for Howard to pay more than $200 per month in the future. The court reminded the parties that either party could return to court by filing a motion to increase or decrease the restitution amount or to request that the restitution obligation be terminated. The court noted that Howard possessed the special skill of sales, which would be an asset in the travel business. The court also stated that Howard had effectively "sold" herself to the host travel agency because she convinced them to allow her to work for them as an independent contractor. Regarding her financial resources, the court found that Howard had financial assistance from her mother, her ex-husband, and her future husband, which enabled her "to take all her financial resource[s] and use [them] in the way that she finds appropriate[.]" The court also found that Howard had the potential to earn an income of $24,000 per year, which was tax-free. After referring to its initial ruling of "no less than

$200" as vague, it ordered Howard, pending her eligibility for a Community Corrections program, to pay $1,000 per month for eight years, for a total of $96,000 in restitution.

The trial court's "Order on Motion to Clarify" was entered on March 10, 2011. In it, the court ordered the following, in pertinent part:

> The Court had previously ordered that the Defendant should pay <u>no less than</u> $200.00 monthly[,] which could be adjusted pursuant to either party's right to file Motions to increase payments or decrease payments depending on the Defendant's financial resources and future ability to pay. The Court's original Order did not set a definite amount with consideration of future ability to pay. The Court's original Order only considered the Defendant's statement that she could pay at least $200.00 monthly. The Court's original Order violated [Tennessee Code Annotated section] 40-35-304(c).

> After the hearing with findings in this Order and on the record the Court ORDERS that the Defendant has sufficient financial resources and future ability to pay $1,000.00 per month. That is a finding at this present time of ability to pay a minimum of $96,000.00 over the course of 8 years if payments are maintained at a minimum [of] $1,000.00 per month. The Defendant is also allowed to make application to the Community Corrections Program as was originally ordered on 2/11/11.

Howard filed a timely notice of appeal on March 14, 2011.

## ANALYSIS

Howard argues that the trial court's order requiring her to pay $96,000 in restitution at the rate of $1,000 per month for eight years was unreasonable, given her financial resources and ability to pay. In response, the State contends that the trial court properly set the amount of restitution after evaluating the victim's loss and Howard's financial resources and ability to pay. Moreover, the State asserts that the victim's loss exceeded the amount of restitution ordered and that the evidence presented at the sentencing hearings supported the amount of restitution ordered by the trial court. Upon review, we modify the restitution to $500 per month for eight years for a total of $48,000.

Initially, we must determine whether this court has jurisdiction of Howard's case. State v. Comer, 278 S.W.3d 758, 760 (Tenn. Crim. App. 2008); State v. Rodney Northern, No. E2009-01969-CCA-R3-CD, 2010 WL 2852288, at *2 (Tenn. Crim, App., at Knoxville, July 21, 2010). Here, the relevant judgment of conviction was entered February 14, 2011.

Typically, a judgment in a criminal case becomes final thirty days after its entry unless a notice of appeal or a delineated post-trial tolling motion is filed. Tenn. R. App. P. 4(a), (c). After this thirty-day period, a trial court generally does not have the authority to amend its judgment. State v. Pendergrass, 937 S.W.2d 834, 837 (Tenn. 1996) (citing State v. Moore, 814 S.W.2d 381, 382 (Tenn. Crim. App. 1991)). However, a trial court may amend or correct a judgment within thirty days of its entry and prior to the filing of a notice of appeal. Id. ("Once the trial court loses jurisdiction, it generally has no power to amend its judgment.").

In this case, Howard filed a "Motion for Clarification of Judgment" on February 24, 2011, well within the thirty-day time period. In addition, the hearing on the "Motion for Clarification of Judgment," the entry of the March 10, 2011 "Order on Motion to Clarify," and the filing of Howard's March 14, 2011 notice of appeal all occurred within thirty days of entry of the judgments of conviction in this case. Because the "Order on Motion to Clarify" was filed within thirty days of the entry of the judgments, the trial court retained jurisdiction of the case at the time that it entered its amended order.

We must also determine whether the February 14, 2011 judgment for the theft conviction and the March 10, 2011 "Order on Motion to Clarify" constituted final judgments from which Howard could appeal. Recently, different panels of this court have issued conflicting opinions regarding whether jurisdiction existed in cases in which the judgment of conviction failed to supply the amount of restitution or failed to set a schedule for restitution payments. Compare Comer, 278 S.W.3d at 760-62 (concluding that this court did not have jurisdiction where the judgment of conviction was not a final order because it incorporated by reference an earlier restitution order, which stated the amount of restitution but provided that the payment schedule for restitution would be set by the trial court following the appeal), and Rodney Northern, 2010 WL 2852288, at *3-4 (concluding that this court did not have jurisdiction where the judgment of conviction was not a final order because the judgment stated that restitution was "[To Be Determined] at hearing" and the later restitution order "neither mentioned nor expressed an amendment of the judgment of conviction form[,]" was not statutorily proper, and failed to provide a "schedule for or method of payment of the restitution"), with State v. Donna Harvey, No. E2009-01945-CCA-R3-CD, 2010 WL 4527013, at *3-5 (Tenn. Crim. App., at Knoxville, Nov. 9, 2010) (exercising jurisdiction despite the fact that the judgment of conviction, which was the result of a guilty plea agreement, decided all sentencing issues other than the amount of and payment schedule for restitution in contravention of code section 40-35-304(g)(1) and the later restitution order failed to provide a monthly payment schedule and ordered the probation officer to interview the defendants before setting a monthly payment schedule); see also State v. William Chandler Daniels, No. E2009-02172-CCA-R3-CD, 2010 WL 5343776, at *2

(Tenn. Crim. App., at Knoxville, Dec. 23, 2010) (noting the court's diverging opinions in Comer, Rodney Northern, and Donna Harvey).

Pursuant to Tennessee Rule of Appellate Procedure 3(b), a convicted criminal defendant "has a right to appeal when the trial court has entered a final judgment of conviction." Comer, 278 S.W.3d at 760-61 (internal quotation marks omitted). In other words, "Rule 3 appeals . . . may be taken only from final judgments." State v. Maddox, 603 S.W.2d 740, 741 (Tenn. Crim. App. 1980). Moreover, the General Assembly has statutorily limited this court's appellate review to final judgments of trial courts in felony and misdemeanor criminal cases. T.C.A. § 16-5-108(a)(1) (2006). The Tennessee Supreme Court has held that "a judgment is final 'when it decides and disposes of the whole merits of the case leaving nothing for the further judgment of the court.'" Richardson v. Tenn. Bd. of Dentistry, 913 S.W.2d 446, 460 (Tenn. 1995) (quoting Saunders v. Metro. Gov't of Nashville & Davidson Cnty., 383 S.W.2d 28, 31 (Tenn. 1964)).

Undeniably, the February 14, 2011 judgment of conviction regarding the theft offense utilized the standard judgment of conviction form. See Tenn. R. Sup. Ct. 17 (promulgating uniform judgment document for criminal cases); Rodney Northern, 2010 WL 2852288, at *2. However, we must determine whether the February 14, 2011 judgment constituted a "final judgment" from which Howard could appeal. The February 14, 2011 judgment stated that Howard "owes $215,000 [and] cannot pay that amount but must pay no less than $200 a month." Noticeably absent from the judgment was a total restitution amount, a payment schedule, and a payment amount. Accordingly, the February 14, 2011 judgment cannot be considered a "final judgment."

We must next determine whether the March 10, 2011 "Order on Motion to Clarify" amended the February 14, 2011 judgment of conviction and cured it of its deficiencies, which resulted in a final judgment. See Rodney Northern, 2010 WL 2852288, at *3. As we previously discussed, because the March 10, 2011 order was entered within thirty days of the February 14, 2011 judgment and prior to the filing of a notice of appeal, the trial court retained jurisdiction of the case at the time the March 10, 2011 order was entered. In order to determine whether the March 10, 2011 order properly amended the February 14, 2011 order to result in a final judgment, we must consider whether the judgment of conviction incorporated the subsequent order or whether the order amended the earlier judgment of conviction. See id. at *3. Although the February 14, 2011 judgment did not specifically state that the total restitution amount, payment schedule, and payment amount would be determined at a later hearing, the "no less than $200 a month" language signaled the need for a later hearing to clarify those details. Moreover, even though the March 10, 2011 "Order on Motion to Clarify" did not specifically state that it amended the February 14, 2011 judgment, it referenced the February 14, 2011 judgment and stated that: (1) the previous

judgment violated Tennessee Code Annotated section 40-35-304(c) because it failed to "set a definite amount with consideration of future ability to pay[,]" (2) a subsequent hearing took place in order to determine Howard's financial resources and ability to pay, and (3) Howard had "sufficient financial resources and future ability to pay" restitution of at least $96,000 at the rate of $1,000 per month for eight years. Consequently, we conclude that the March 10, 2011 order amended the February 14, 2011 judgment of conviction, resulting in a final judgment in this case.

Having concluded that we have a final judgment appealable pursuant to Rule 3 of the Tennessee Rule of Appellate Procedure, we must now review this appeal on its merits. Howard argues that the trial court's order requiring her to pay $96,000 in restitution at the rate of $1,000 per month for eight years for the theft conviction was unreasonable, given her financial resources and ability to pay. Specifically, Howard contends that the trial court erred in finding that she had an ability to earn between $1,000 and $2,000 in travel bookings a month because she provided this earning potential as an estimate that did not take into account her business expenses. Howard also argues that the trial court erred in finding that the assistance she received from her mother, her ex-husband, and her current boyfriend increased her financial resources because none of these individuals had a legal obligation to assist her in paying restitution and because her mother's contributions were small and sporadic and her ex-husband's contributions were limited to paying child support for the benefit of her three daughters if they resided with her.

We review a defendant's challenges to the trial court's order of restitution using a de novo standard of review with a presumption that the trial court's ruling was correct. T.C.A. § 40-35-401(d) (2006); State v. Johnson, 968 S.W.2d 883, 884 (Tenn. Crim. App. 1997). Restitution is required, as here, "[w]henever a felon is convicted of stealing or feloniously taking or receiving property, or defrauding another of property." T.C.A. § 40-20-116(a) (2006). However, regardless of the applicability of Tennessee Code Annotated section 40-20-116, all restitution orders must follow the procedure established in code section 40-35-304. T.C.A. § 40-35-304(g) (2006).

An order for restitution should not only compensate the victim but also punish and rehabilitate the defendant. Johnson, 968 S.W.2d at 885. It is well-established that there is no set formula for determining restitution. Id. at 886. "Whenever the court believes that restitution may be proper or the victim of the offense or the district attorney general requests, the court shall order the presentence service officer to include in the presentence report documentation regarding the nature and amount of the victim's pecuniary loss." T.C.A. § 40-35-304(b) (2006). The restitution amount ordered by the trial court must be reasonable but does not have to equal the victim's pecuniary loss. State v. Smith, 898 S.W.2d 742, 747 (Tenn. Crim. App. 1994) (citing T.C.A. § 40–35–303(d)(10) (Supp. 1994); State v. Michael

A. Chastain, No. 88–222–III, 1989 WL 54902, at *6 (Tenn. Crim. App., at Nashville, May 26, 1989), perm. app. denied (Tenn. Oct. 2, 1989)). "Pecuniary loss" is defined as the following:

(1) All special damages, but not general damages, as substantiated by evidence in the record or as agreed to by the defendant; and

(2) Reasonable out-of-pocket expenses incurred by the victim resulting from the filing of charges or cooperating in the investigation and prosecution of the offense; provided, that payment of special prosecutors shall not be considered an out-of-pocket expense.

T.C.A. § 40-35-304(e) (2006). At the sentencing hearing the trial court shall specify "the amount and time of payment or other restitution to the victim and may permit payment or performance in installments." Id. § 40-35-304(c) (2006). Moreover, "[i]n determining the amount and method of payment or other restitution, the court shall consider the financial resources and future ability of the defendant to pay or perform." Id. § 40-35-304(d) (2006). We note that "[a]n order of restitution which obviously cannot be fulfilled serves no purpose for the appellant or the victim." Johnson, 968 S.W.2d at 886. However, if the restitution is not paid in full, the unpaid portion of the restitution may be converted to a civil judgment. T.C.A. § 40-35-304(h)(1) (2006); State v. Bottoms, 87 S.W.3d 95, 108 (Tenn. Crim. App. 2001).

Here, Howard entered a guilty plea with the length and manner of sentencing to be determined by the trial court. In the February 14, 2011 judgment, the trial court sentenced her to concurrent sentences of eight years and ordered her to pay "no less than $200 per month[,]" pending her eligibility for a Community Corrections program. Consequently, Howard was ordered to serve an alternative sentence, which was composed of a "community based alternative to incarceration" and "[p]ayment of restitution to the victim[.]" T.C.A. § 40-35-104(c)(2), (9) (2006). A defendant sentenced pursuant to Tennessee Code Annotated section 40-35-104(c)(2) "shall be responsible for the payment of the restitution until the expiration of the sentence imposed by the court, and any payment or performance schedule established by the court shall not extend beyond the expiration date[.]" Id. § 40-35-304(g)(2) (2006).

The record shows that the trial court had sufficient evidence to determine the amount of the victim's pecuniary loss. However, we conclude that the record does not support the trial court's calculation of the victim's loss. At the sentencing hearing, the State entered several exhibits establishing the amount of the victim's loss, which included the following: the amount of cash missing from Outland Travel's deposits, a note signed by clients of the

travel agency stating that they gave Outland Travel cash for a trip that was missing,[1] the amount of missing cash payments for Carnival Cruise bookings, the amount of missing cash payments from Vacation Express bookings, and an itemization of the trips charged by Howard to the Outland Travel's credit card, for which she did not reimburse the business.[2] The aforementioned exhibits, which are not repetitive in nature, are represented in the following table:

| | |
|---|---|
| Cash Missing from Deposits | $17,856.94 |
| Missing Cash from Carnival Cruise Bookings | $97,842.48 |
| Missing Cash from Vacation Express Bookings | $30,213.00 |
| Corrected Unpaid Balance that Howard Owed for Trips | $11,038.88 |
| TOTAL | $156,951.30 |

In addition to the aforementioned exhibits, the State also entered an exhibit showing that Howard had deposited over $60,000 in cash into her bank accounts during the time period covered by the indictment and one exhibit showing deposits of checks made payable to Outland Travel that were deposited into the Farmer's Lake bank account.[3] Because these deposits were not definitely linked to the money Howard stole from Outland Travel and because the deposits could have been accounted for in other exhibits showing missing funds, we decline to include the amounts depicted in these two exhibits in calculating the victim's loss. Accordingly, we conclude that the victim's loss in this case was $156,951.30.

The record shows that the trial court addressed Howard's financial resources. See id. § 40-35-304(d). The court specifically found that Howard had financial assistance from her mother, her ex-husband, and her future husband, which enabled her "to take all her financial resource[s] and use [them] in the way that she finds appropriate[.]" During the two sentencing hearings, Howard admitted that her boyfriend, with whom she resided, had been paying all of her expenses and would continue to pay all of her bills until she was able to pay her own expenses. She also acknowledged that her mother sometimes gave her money to

---

[1] This amount was accounted for in the exhibit showing cash missing from Outland Travel's deposits.

[2] A mathematical error in the amount of $0.60 existed in the calculation of the unpaid balance that Howard owed for trips; therefore, we have included the corrected amount in our calculation of the victim's loss.

[3] This exhibit was retained by the trial court clerk's office, although the record indicates that it documented Howard's deposits of over $60,000 in cash into her own bank accounts.

cover her expenses or her daughters' expenses. Howard stated that the only money she received from her ex-husband was $308.74 per week in child support at the time that her daughters resided with her.

The trial court also addressed Howard's future ability to pay. See id. § 40-35-304(d). The court carefully evaluated her income history, her earning potential as an independent contractor for a host travel agency, and her documentation regarding her regular expenses. Howard testified that she hoped to earn $1,000 to $2,000 per month in travel bookings as an independent contractor, although she would have to pay her business expenses out of this income. In addition, the proof at the hearing showed that Howard earned as much as $14 an hour when she worked for Outland Travel. Howard also testified as to her regular expenses,[4] which are detailed in the table below:

| | |
|---|---|
| One-Half Share of Rent | $225.00 |
| Electric Bill | $55.00 |
| Cell Phone | $45.00 |
| Car Payment | $328.00 |
| Monthly Citibank MasterCard payment | $85.00 |
| Monthly Orchard payment | $65.00 |
| Monthly Educational Loans Payment | $110.00 |
| Monthly Car Insurance Payment | $85.00 |
| Monthly Verizon payment | $25.00 |
| Monthly Payment to Daughter's Orthodontist | $195.00 |
| Monthly Payment to Memorial Hospital | $100.00 |
| Groceries | $200.00 |
| Gas | $140.00 |
| TOTAL | $1,658.00 |

---

[4] Because Howard indicated that some of her regular expenses varied, we averaged these amounts for the purpose of calculating her monthly expenses.

Aside from these monthly expenses, Howard also stated that she had the following debts: an over $5,000 debt owed to Citibank MasterCard; a $4,500 debt for educational loans; a $350 debt owed to Verizon, a $1,600 debt owed to daughter's orthodontist; a $55 debt owed to T-Mobile; a $300 debt owed to Memorial Hospital; and a $350 debt owed to Volunteer Electric.

Balancing the victim's loss in this case with Howard's financial resources and future ability to pay, we conclude that it is appropriate to reduce the amount of restitution in this case to ensure that Howard can fulfill the restitution obligation. Accordingly, we order that the victim's loss in this case is $156,951.30 and that the restitution, based on the proof established of Howard's present ability to pay, is reduced to $48,000, which shall be paid at the rate of $500 per month for eight years. The victim maintains the right to request that the trial court order Howard to pay the entire amount of the victim's loss, $156,951.30, or any amount in excess of the restitution ordered up to the full amount of the victim's loss, in the event that Howard's ability to pay favorably changes. In all other respects, the trial court's judgments are affirmed.

## CONCLUSION

Upon review, we reverse the trial court's order that Howard pay $1,000 per month for eight years for a total of $96,000 in restitution, and we amend the judgments to show that the victim's loss in this case is $156,951.30 and that the restitution, based on the proof established of Howard's present ability to pay, is reduced to $48,000, which shall be paid at the rate of $500 per month for eight years. The victim maintains the right to request that the trial court order Howard to pay the entire amount of the victim's loss, $156,951.30, or any amount in excess of the restitution ordered up to the full amount of the victim's loss, in the event that Howard's ability to pay favorably changes. In all other respects, the trial court's judgments are affirmed.

_____
CAMILLE R. McMULLEN, JUDGE